Mark Strauss, Respondent-Appellant, v Long Island Sports, Inc., Doing Business as The New York Nets, Appellant-Respondent, et al., Respondents.

Second Department, January 9, 1978

502

## APPEARANCES OF COUNSEL

*Meyer, English, Cianciulli & Peirez, P. C. (Bernard S. Meyer* and *Jeffrey G. Stark* of counsel), for appellant-respondent.

*Mordecai Rosenfeld* for respondent-appellant.

## OPINION OF THE COURT

MARGETT, J.

This action is brought by a disgruntled New York Nets season ticket holder who seeks rescission of the purchase of his tickets because of the Nets' trade of Julius Erving (Dr. J), the team's star, at the beginning of the 1976-1977 professional basketball season. The principal issue is whether Special Term properly determined that the action could be maintained as a class action. Additionally, there is an issue as to whether appellant-respondent's motions to consolidate four pending District Court actions were properly denied.

Plaintiff is the owner of four season tickets for the Nets' 1976-1977 season. He purchased the tickets in the summer of 1976 after the Nets won the 1975-1976 American Basketball Association Championship and became a member of the National Basketball Association. During that summer the Nets placed several advertisements in various newspapers by which they solicited purchasers for season tickets. Some of these advertisements included the following language: "See the fantastic Dr. 'J' in action. Designated league MVP and PRO player of the year. Sport magazine playoff-MVP."

Plaintiff alleges that he purchased his season tickets on the basis of this "publicized presence" of Dr. J. He alleges further, however, that "[a]ll persons who purchased season tickets for the Nets' 1976-1977 season did so in the reasonable expectation that Julius Erving would play unless injured, as the Nets had advertised." The complaint then recites that the Nets sold Dr. J to the Philadelphia 76ers for $3,000,000, and goes on to allege that: "(a) As a result, all persons who purchased season tickets have been deprived of the principal reason for their purchase.

"(b) In effect, there has been a willfull failure on the part of the Nets to provide the consideration that was advertised by the Nets themselves and paid for by all season ticket buyers.

"(c) The implicit contract between the Nets and all persons who purchased season tickets was that Julius Erving would play if possible. The Nets have violated that contract."

Plaintiff instituted his action in October, 1976. At about the same time and subsequent thereto, six other actions were instituted in various District Courts of the County of Nassau by season ticket holders complaining of the trade of Julius Erving. Two of these actions were thereafter discontinued,

leaving two small claims actions[1] and two District Court actions.[2]

Contemporaneously with the filing of the instant action, the Attorney-General instituted an investigation into the trade of Julius Erving pursuant to the consumer fraud provisions of article 22-A of the General Business Law. That investigation culminated in an agreement between the Attorney-General's office and the Nets (entered into on or about December 10, 1976) whereby season ticket holders could obtain a 10% rebate of their purchase price. The offer was limited to those ticket holders who executed an affidavit stating that (a) the season tickets were purchased solely on the basis that Julius Erving would play for the Nets during the 1976-1977 season, (b) the tickets were purchased solely for personal use and not for business or resale purposes and (c) the New York Nets would be released from any further claims.

As the various District Court actions were filed against the appellant-respondent, it moved for their consolidation into the instant action pending in the Supreme Court. Plaintiff cross-moved for an order declaring his suit to be a proper class action. In an opinion dated March 14, 1977, Mr. Justice YOUNG sustained plaintiff's cross motion to proceed as a class representative. Before an order could be entered thereon, appellant-respondent moved for reargument (and for consolidation of two more District Court actions which had apparently been commenced subsequent to Mr. Justice YOUNG's opinion). Special Term substantially adhered to its prior determination and the order appealed from was entered on June 1, 1977.

The order provides: (1) The instant action is declared to be a class action. (2) The class is defined to include all persons who (a) purchased season tickets for the Nets' 1976-1977 season subsequent to the first-advertised presence of Julius Erving but prior to the first public announcement that Erving had been traded, (b) have not accepted the Attorney-General's proposed settlement and (c) "bought their tickets, at least in part, because of their expectation that Mr. Julius Erving would be playing for the Nets if not injured". (3) Notice of pendency of the action would be mailed to all potential class members. (4) The cost of printing and mailing the notice of

---

1. *Maiella v Long Is. Sports* and *McGuiness v Long Is. Sports.*
2. *Krohn v New York Nets* and *Prisco v Long Is. Sports.*

pendency is to be divided equally between the parties. (5) The form of the notice of pendency is to be substantially the same as that proposed by the plaintiff. (6) Appellant-respondent's motions for consolidation are denied.

■ On appeal appellant-respondent raises several grounds as to why class action status should not lie. The most important of these grounds—and the one which is central to a proper resolution of the class action issue—is that questions of law or fact affecting only individual members predominate over questions common to the class (see CPLR 901, subd a, par 2). It is argued that questions of reliance and damages predominate and that these questions are more a matter of individual proof. We agree essentially that *insofar as plaintiff's complaint states a cognizable cause of action,* individual questions of reliance do predominate. Accordingly, we reverse and deny plaintiff's cross motion for an order declaring his action to be a class action.

■ ■ It is elementary that in any action based upon representations in advertising—whether the action sounds in fraud or in warranty—the plaintiff must prove knowledge of, and reliance upon, the representations alleged *(Randy Knitwear v American Cyanamid Co.,* 11 NY2d 5, 12; *Kuelling v Lean Mfg. Co.,* 183 NY 78, 85; *Friedman v Medtronic, Inc.,* 42 AD2d 185, 190; *Funk v Kaiser-Frazer Sales Corp.,* 23 AD2d 771; 24 NY Jur, Fraud and Deceit, §§ 157-160; 47 NY Jur, Products Liability, §§ 82-83). It is true that the language of CPLR 901 (subd a, par 2), which requires that questions of law or fact common to the class must predominate over "any questions affecting only individual members", clearly indicates an intent that the mere existence of individual questions should not defeat the granting of class status (see 2 Weinstein-Korn-Miller, NY Civ Prac, par 901.08, p 9-31). We are fully aware of the courts' power to sever certain issues while permitting others to be tried as class actions (CPLR 906) and are cognizant of the fact that some commentators have suggested that questions of reliance—particularly in fraud cases —be so severed (see 2 Weinstein-Korn-Miller, NY Civ Prac, par 901.08, p 9-33; see, also, 3B Moore's Fed Prac, par 23.45 [2], pp 23-762—23-763). The basic theory behind such severance is that judicial economy might be served by trying common questions in one action (2 Weinstein-Korn-Miller, NY Civ Prac, par 901.08, p 9-33).

■ While laudable in theory, the practicality of such sever-

ance has been questioned where individual reliance would not be "substantially established by the very nature of the proofs on the issue of liability" (*Morris v Burchard*, 51 FRD 530, 536 [SD NY]; see, also, *Tober v Charnita, Inc.*, 58 FRD 74, 84-85 [MD Pa]; *Hoffman v Charnita, Inc.*, 58 FRD 86, 91 [MD Pa]). Certainly, in a case where common exposure to—or reliance upon—alleged misleading advertising cannot be readily inferred, there is no advantage to be gained from permitting the action to proceed as a class action since the proceeding is likely to "splinter into individual trials" (Comment, Litigating the Antitrust Conspiracy Under Amended Rule 23, 54 Va L Rev 314, 318).

The papers in the record indicate that prior to June 30, 1976, over 2,622 Nets season tickets had been sold. These represented over half of the tickets sold for the entire season. Yet prior to June 30, 1976, newspaper advertising had been published only between June 18 and June 23. The only other advertising before September 19, 1976 was on one day, July 18, 1976. Between July 18, 1976 and September 19, 1976, a period during which there was no newspaper advertising for the Nets' tickets, 761 tickets were sold. On September 21, 1976 Erving first announced that he would not appear at training camp. Thereafter, another 276 tickets were sold.

Obviously, different factors were at work in each of those periods affecting the motivation of ticket purchasers. Ticket purchasers may have been motivated by the fact that the Nets had won the American Basketball Association championship, or by the fact that they had been admitted to the National Basketball Association and would be playing all of the established teams. Business reasons may have been the dominant motive for the purchases, or the geographical location of the team may have figured into the decision (pro basketball enthusiasts in Nassau County might have been inclined to buy season tickets to the Nets games rather than travel to Manhattan to see the Knickerbockers). In short, by no stretch of the imagination may one comfortably presume that a majority of season ticket holders purchased in reliance on the Nets' newspaper advertising. Indeed, many season ticket holders may not have even seen defendant's advertisements (see *Edelman v Lee Optical Co.*, 24 Ill App 2d 216).

The situation presented at bar may be effectively contrasted with three of the cases relied on by Special Term. *Guadagno v Diamond Tours & Travel* (89 Misc 2d 697) was brought on

behalf of some 400 persons who participated in three separate charter tours to a Jamaican resort over a three-week period in December, 1975 to January, 1976. The owners of the resort, their exclusive marketing agent, and various travel tour wholesalers and retailers who solicited the plaintiffs, were named as defendants. The complaint was based on conspiracy, fraudulent misrepresentation and breach of contract in connection with the sale of the travel tours. Class action status was granted on the grounds that the case involved a "cohesive and finite group of similarly situated vacationers, who relied upon essentially identical representations in advertising matter." It would certainly be expected that people taking three charter tours, to a particular resort, all within the space of three weeks, would be subjected to (and would rely) on the same advertising matter. In *Guadagno,* a certain presumption of reliance might be indulged in. For the reasons stated above, no such presumption would be warranted with basketball fans who purchased their tickets over a period of months and who may never have relied upon, or seen, any of the seven days of newspaper advertising during the summer of 1976.

*Siegel v Chicken Delight* (271 F Supp 722) was cited by Special Term for the notion that "where representations are made as part of a 'common nucleus of operative facts', common questions predominate over the individual issues of reliance" (89 Misc 2d 827, 834). The *Chicken Delight* case was an antitrust action brought by Chicken Delight franchisees, and the "common nucleus of operative facts" language used by the District Court was addressed to the plaintiffs' antitrust challenge to the franchise agreement. *Chicken Delight* is clearly distinguishable because of the common agreement.

*Siegel v Realty Equities Corp. of N. Y.* (54 FRD 420 [SD NY]) is instructive because it involved a statutory fraud claim brought pursuant to section 10b-5 of the Rules of the Securities and Exchange Commission (17 FCR 240.10b-5) alleging that the market value of publicly traded stock had been artificially inflated by reason of the defendants' misrepresentation. Class action status was permitted on the ground that individual proof of reliance was not necessarily an element of the plaintiff's cause of action, since the suit charged, in effect, a fraud on the market, not on the individual class members (*supra,* p 425).

Plaintiff contends that "fraud on the market" is no different when one sells stock rather than tickets to basketball games.

Reliance is placed on *Affiliated Ute Citizens v United States* (406 US 128) and *Titan Group v Faggen* (513 F2d 234, 239, cert den 423 US 840) for the claim that a consumer is presumed to have relied on a material representation.

Both *Affiliated Ute Citizens* and *Titan Group* are securities fraud cases. In *Affiliated Ute Citizens,* the Supreme Court construed rule 10b-5 so as *not* to require a showing of reliance on the failure to disclose material information (pp 153-154): "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision * * * This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact".

*Titan Group* explained *Affiliated Ute Citizens* as follows (513 F2d, at p 239): "Unlike instances of affirmative misrepresentation where it can be demonstrated that the injured party relied upon affirmative statements, in instances of total nondisclosure, as in *Affiliated Ute,* it is of course impossible to demonstrate reliance, and resort must perforce be had to materiality, i.e., whether a reasonable man would attach importance to the alleged omissions in determining his course of action."

Obviously, neither of these cases supports plaintiff's thesis that he need not prove reliance on the Nets' advertising. Plaintiff alleges affirmative misrepresentation, *not* material withholding of information. Other section 10b-5 cases *do* involve affirmative misrepresentations and *do* dispense with a showing of reliance provided the misrepresentation is material. But it appears from these decisions that section 10b-5 cases are very much distinguishable from common-law fraud cases.

In *Blackie v Barrack* (524 F2d 891, 907) the court held: "Here, we eliminate the requirement that plaintiffs prove reliance directly in this context because the requirement imposes an unreasonable and irrelevant evidentiary burden. A purchaser on the stock exchange may be either unaware of a specific false representation, or may not directly rely on it; he may purchase because of a favorable price trend, price earnings ratio, or some other factor. Nevertheless, *he relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price*—whether he is aware of it or not,

the price he pays reflects material misrepresentations." (Emphasis supplied.) The Ninth Circuit in *Blackie* also explicitly noted that (p 907) "although derived from it, the 10b-5 action is not coterminous with a common law fraud action." (See, also, *Tober v Charnita, Inc.*, 58 FRD 74, 84, *supra*, where class action status was sustained as to the first cause of action [10b-5] but rejected with respect to the second cause of action [common-law fraud], because "it cannot be seriously contended that proof of individual reliance is no longer a required element of common law fraud".)

■ Accordingly, a distinction can and should be made between securities fraud cases and the case at bar. In the securities cases, reliance by some stock purchasers on the defendant's misrepresentations may have affected the price of the stock traded on the open market, thereby causally affecting a purchaser (or seller) not privy to those misrepresentations. In the ticket purchaser case, on the other hand, whether one purchaser relied in purchasing his ticket on management's misrepresentation of fact has no causal relation to the purchase of a ticket by another person not privy to those misrepresentations. I would conclude, therefore, that to the extent that plaintiff's cause of action is based upon alleged misrepresentations contained in defendant's newspaper advertisements, proof of reliance is the *sine qua non* of recovery and of such fundamental importance that class action status was improvidently declared.

Plaintiff further argues, however, that his cause of action is not dependent upon the advertised presence of Julius Erving. It is contended that the advertisements only underscore the fact that the Nets recognized the unique presence of Erving, and that the essence of the complaint is that plaintiff and all other season ticket holders purchased season tickets with "the reasonable expectation that Julius Erving would play unless injured". This alternative construction of the cause of action may best be characterized as one alleging failure of consideration or frustration of contract.

■■ To the extent that the complaint pleads such failure of consideration or frustration of contract, it does not state a cause of action. Assuming, as plaintiff does, that every person who bought a season ticket did so in the expectation that Dr. J would play for the Nets, any such expectation was unreasonable as a matter of law (at least in the absence of advertising calculated to induce such an expectation—but if advertising

be taken into account, the question of individual reliance becomes paramount). In order for one to show frustration of contract, "the frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract." (Restatement 2d, Contracts [Tentative Draft No. 9, 1974], par 285, Comment *a* p 78.) In this age of "team-jumping ball players" and "renegotiated" athletic contracts,[3] the risk that Dr. J might not be playing for the Nets might "fairly * * * be regarded as within the risks that * * * [a purchaser] assumed under the contract."

█ I would add that although the "settlement" arranged by the Attorney-General's office is not a bar to the maintenance of a class action such as that herein proposed (cf. CPLR 901, subd a, par 5), it is indicative of the fact that plaintiff's action does not present a situation where the members of his purported class "would go begging for justice without the class action" *(Eisen v Carlisle & Jacquelin,* 417 US 156, 185 [Justice DOUGLAS dissenting]). The papers in the record indicate that the number of season ticket holders who filed affidavits with the Attorney-General closely approximated the number of season ticket holders who called or wrote the Nets' offices seeking refunds of tickets. This factor, combined with the fact that only seven lawsuits were apparently instituted against defendants, would suggest a certain paucity of litigants in the class plaintiff seeks to represent. "If a class of interested litigants is not already in existence the court should not go out of its way to create one without good reason" *(Berley v Dreyfus & Co.,* 43 FRD 397, 398-399; see, also, *Morris v Burchard,* 51 FRD 530, 536, *supra).*

█ Finally, appellant-respondent's motion to consolidate the instant action with pending District Court actions should have been granted. The issue of whether defendant's newspaper advertising contains an affirmation of the fact that Julius Erving would not be traded is a common issue—perhaps the only common issue—and, although that issue does not predominate, judicial economy would be served by consolidation.

The remaining points raised by appellant-respondent (with respect to the form of the class action order) and plaintiff's cross appeal (as to the definition of the class) are, of course, rendered academic by our determination herein.

---

**3.** See, e.g., a very lively exchange of views on the subject in the Sports Section of the *New York Times,* Sunday, Nov. 21, 1976.

MOLLEN, P. J., TITONE and RABIN, JJ., concur.

Order of the Supreme Court, Nassau County, entered June 1, 1977, reversed, with $50 costs and disbursements, motions for consolidation granted and cross motion for class action relief denied.