## (September 14, 1981)

■ MIMNORM REALTY CORPORATION, on Behalf of Itself and All Others Similarly Situated, Respondent, v SUNRISE FEDERAL SAVINGS AND LOAN ASSOCIATION, Appellant. — In an action to recover damages for breach of a mortgage loan agreement, defendant appeals from an order of the Supreme Court, Nassau County (Young, J.), entered August 8, 1980, which, *inter alia,* granted plaintiff's motion for an order directing that the action proceed as a class action, and ordered defendant to produce certain documents and information relevant to plaintiff's class action claim. Order affirmed, with $50 costs and disbursements. The discovery shall proceed at the place directed in the order under review, at a time to be fixed in a written notice of not less than 20 days, to be given by plaintiff, or at such other time and place as the parties may agree. Conditioning its obligation, *inter alia,* upon plaintiff's payment of a commitment fee and its agreement to pay certain mortgage loan closing costs, Sunrise Federal Savings and Loan Association agreed to lend $150,000 to the plaintiff. Relying on the terms of the commitment letter Sunrise had sent its corporate predecessor, plaintiff paid the $1,500 commitment fee, subsequently paid the other loan expenses when the mortgage transaction closed, and then brought this action on its own behalf and for all others similarly situated to

recover the amount of the fee. A primary issue between the parties is the meaning of particular language in the commitment letter which declared: "The commitment fee is non-refundable. Upon actual closing, such sum shall be credited against the expense[s] of the loan." The items listed in the letter as loan expenses included the commitment fee itself and charges for appraisal, credit report, inspection, recording, title examination, mortgage tax and legal costs. When the transaction actually closed, however, Sunrise submitted a loan settlement statement to the plaintiff which did not credit the commitment fee against the various closing expenses it enumerated. The statement contained a declaration — intended for the borrower's signature — which provided that the borrower "agrees to the correctness thereof, and authorizes and ratifies the disbursement of the funds as stated therein." After Sunrise refused plaintiff's demand for a credit or refund in the amount of the commitment fee, plaintiff signed the statement. In its complaint, plaintiff declares that it sues for itself and others similarly situated who entered into commitment agreements with Sunrise which provided "that commitment fees paid were to be credited against expenses at closing and who failed to receive such credit." After serving its answer, Sunrise sought dismissal of the action via summary judgment, but Special Term denied the motion, finding that there were "ambiguities in the documents," and we affirmed *(Mimnorm Realty Corp. v Sunrise Fed. Sav. & Loan Assn.,* 66 AD2d 1036). Plaintiff then moved for class action certification. Special Term granted the motion together with ancillary relief and defendant appealed. We believe affirmance is required. The record reveals that there were no negotiations between plaintiff and Sunrise concerning closing costs and that those expenses were first listed in the commitment letter at issue. When it moved for summary judgment, and in its subsequent appeal upon denial of that motion, Sunrise argued that "no question of fact exists that warrants a trial" because the commitment letter was clear and it affected all borrowers the same way. Faced with our affirmance on the summary judgment appeal and the circumstances which now confront it, Sunrise contends that the crucial language of the commitment letter (which is essentially identical in the four forms of the letter used by Sunrise) is ambiguous and there can be no commonality of questions affecting the proposed class because different borrowers may have interpreted the language differently. Our dissenting colleagues base much of their reasoning upon the fact that many different individuals were involved in the 90 transactions which utilized the forms in issue. But nowhere in the papers at Special Term or even here does Sunrise claim that mortgage closing costs were separately negotiated with each borrower. While admitting that Job Development Authority borrowers received the commitment letter without being seen or spoken to by Sunrise representatives until the closing itself, the most Sunrise permits itself to say concerning other borrowers is that commitment fees were "often discussed" during loan negotiations. But despite its knowledge of those discussions, Sunrise fails to claim that the meaning of the commitment letters varied from transaction to transaction. The overriding fact is that regardless of discussions or even negotiations, only two interpretations of the language at issue are available. Either the borrower is entitled to credit the commitment fee against its other loan expenses or it is not. Therefore, we cannot comprehend how the existence of preclosing discussions of loan expenses can alter the fact that the common and underlying question in all the cases is the meaning of the commitment letter language. Since that language was essentially identical in all the commitment letters, once its meaning has been established by trial, the most significant issue in all of the cases will have been decided. Although, as we have noted, Sunrise has failed to specify even one transaction in which the meaning of the terminology was modified by negotiation, if such a

separate issue does exist in any particular situation, it cannot serve to frustrate the plaintiff's right to class action status. Nor is commonality defeated by the asserted affirmative defenses of waiver, ratification, estoppel or merger, for Sunrise does not dispute that all members of the class were charged closing costs in accordance with the loan settlement statements submitted at closing. If assent to those charges created a waiver, ratification, estoppel or merger sufficient to defeat recovery, the legal result should be the same for all members of the class. If other borrowers imitated the instant plaintiff in demanding credit for the commitment fee at the closing, the legal consequences of such demands should be the same for all who took that course. In any event, "the fact that questions peculiar to each individual may remain after resolution of the common questions is not fatal to the class action" *(Friar v Vanguard Holding Corp.,* 78 AD2d 83, 98). To deny class action status — as our dissenting colleagues would have us do — because some members of the proposed class may have discussed loan expenses with Sunrise prior to the loan commitment or because some acquiesced in the loan settlement statement while others may have objected to it would contradict the holding in *Friar* where we rejected the process of weighing individual claims against common claims to determine class action certification questions. We said then (78 AD2d, at p 97): "We *** abjure the weighing process in the belief that the decision as to whether there are common predominating questions of fact or law so as to support a class action should not be determined by any mechanical test, but rather, 'whether the use of a class action would "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated"' [citations omitted]." On the facts adduced, it is apparent that once the class action court has determined what the commitment letter meant and the significance of compliance with the loan settlement statement, the principal issues affecting most of the plaintiffs will have been determined. Class action certification thus will serve the goals of economies of time, effort and promotion of uniformity of decision. We find no merit in defendant's other contentions. Lazer, J. P., Mangano and Gibbons, JJ., concur.

Margett, J., dissents and votes to reverse the order and deny plaintiff's motion, with the following memorandum, in which Cohalan, J., concurs: Because I believe that, when considered together, the nature of this action, its procedural history, and the significant differences in the circumstances surrounding the transactions in which members of the purported class participated, insofar as revealed by the record, require a conclusion that plaintiff has not met its burden of establishing that "there are questions of law or fact common to the class which predominate over any questions affecting only individual members" (CPLR 901, subd a, par 2). I respectfully dissent. In June, 1977 the corporate predecessor of plaintiff entered into an agreement with defendant under which defendant agreed to make a commercial type, first mortgage loan in the amount of $150,000 on certain real property. The loan was to be made in connection with a Job Development Agency (JDA) program under which the mortgagor obtains a 50% mortgage from a bank and a 40% second mortgage from the JDA. The loan agreement was evidenced in part by a "commitment letter" from defendant to the corporate predecessor of plaintiff, which included the following statements: "Approximate closing costs for this mortgage are set forth in the enclosed commitment statement. To accept this commitment you must sign and return one copy of this instrument and the signed statement of expense together with a commitment fee of $1,500.00. The commitment fee is non-refundable. Upon actual closing, such sum shall be credited against the expense[s] of the loan." Attached to the commitment letter was a document entitled "commitment [-] statement of expense", which listed the commitment fee of $1,500 along with other specified fees. The corporate

predecessor signed and returned the commitment letter and expense statement and the requisite commitment fee was paid. At the subsequent mortgage closing, plaintiff, which was represented by counsel, was given a "loan settlement statement" on which defendant had listed certain "expenses incurred in connection with th[e] loan." The list included all the types of fees which had been listed on the "commitment [-] statement of expense", except for the commitment fee. The only reference to the commitment fee that was made in the loan settlement statement was the recital, in a different part of the statement, that defendant had received a commitment fee in the amount of $1,500 from plaintiff. Nowhere on that statement was this fee credited against the listed "expenses incurred in connection with th[e] loan". It appears that at the closing, but before final acceptance of the loan by plaintiff, plaintiff's attorney requested that the commitment fee be refunded or, alternatively, credited against the expenses of the loan. He was advised by defendant that the amount of the commitment fee was not to be refunded, but, on the closing, would be credited against "the previously listed schedule of expenses as per the commitment letter schedule", which, defendant contends, included the commitment fee. Plaintiff proceeded with the closing and accepted the loan. In the course of doing so, plaintiff signed the loan settlement statement, which recited that "[t]he undersigned acknowledges the receipt of this Loan Settlement Statement, and agrees to the correctness thereof, and authorizes and ratifies the disbursement of the funds as stated therein." Shortly thereafter, plaintiff commenced this action on behalf of itself and "all others similarly situated who entered into commitment agreements with defendant * * * providing that commitment fees paid were to be credited against expenses at closing and who failed to receive such credit." The complaint, alleging as it did that "in violation of the provisions of the commitment agreement, defendant failed to credit plaintiff with the $1,500.00 fee", sounded in breach of contract. After issue was joined, defendant moved, among other things, for summary judgment, contending that it had complied with its agreement with plaintiff. More specifically, defendant contended that it had given plaintiff proper credit since the commitment fee itself was an expense of the loan, as reflected by its having been listed on the "commitment [-] statement of expense" form attached to the commitment letter. Defendant also contended that the commitment fee was intended to compensate it for assuring the availability of mortgage funds at a particular rate of interest, and was therefore not subject to refund or credit against other expenses of the loan. Plaintiff countered that the fee was designed only to reimburse the bank for expenses incurred in anticipation of the closing, in the event that the closing did not take place. Special Term denied defendant's motion for summary judgment, stating as follows, in pertinent part: "Defendant's interpretation of the [commitment letter, commitment (-) statement of expense and loan settlement statement] leads the Court to believe that there are ambiguities in the documents. Therefore, this Court finds there is a factual issue which cannot be resolved upon these documents." Defendant appealed to this court from the order of Special Term which denied its motion for summary judgment. Although it had not done so at Special Term, plaintiff argued on appeal that the record showed that it was entitled to summary judgment against defendant (see CPLR 3212, subd [b]). This court affirmed the order of Special Term, without opinion *(Mimnorm Realty Corp. v Sunrise Fed. Sav. & Loan Assn.,* 66 AD2d 1036). It appears that leave to appeal from the order of this court was not sought. After conducting discovery, plaintiff made a motion for an order "declaring" that this action proceed as a class action and for other relief. In addition to seeking to represent those borrowers who had signed the identical form of commitment letter that plaintiff had signed, plaintiff also sought to represent those borrowers who

signed commitment letters that differed in some respects from the form signed by plaintiff, but included language to the effect that upon closing, the commitment fee would be credited against "expenses of the loan". These latter commitment letters were issued to and executed by applicants for residential building loans, land loans, industrial mortgage loans, and industrial building mortgage loans. Special Term granted plaintiff's motion, ordering, among other things, that the action should proceed as a class action on behalf of the following persons: "All persons who on or after October 1, 1973 accepted a commitment letter, as part of any mortgage loan application to [defendant], containing the following, or similar provision: To accept this commitment you must sign and return one copy of this instrument and the signed statement of expense together with a commitment fee of $___. The commitment fee is nonrefundable. Upon actual closing such sum shall be credited against the expense of the loan; who paid the commitment fee and who subsequently, upon closing, did not receive credit for their commitment fees". One of the contentions of defendant which Special Term rejected in deciding the motion was that plaintiff had not established that "there are questions of law or fact common to the class which predominate over any questions affecting only individual members", as required by CPLR 901 (subd a, par 2). In my view, Special Term erred in rejecting this contention. It is apparent that the language of the commitment letter upon which plaintiff will rely at trial is substantially similar and, in many instances, identical to that upon which other members of the purported class would also rely. However, it may not be concluded from this fact alone that common questions predominate over individual ones in this action (see, e.g., *Bailey v Sabine Riv. Auth.*, 54 FRD 42). This is a contract action in which plaintiff's basic contention is that it was the intent of the parties that the commitment fee would be credited against "expenses of the loan", which did not include the commitment fee. In opposition, defendant contends that the commitment fee was intended to be one of the "expenses of the loan" and that, therefore, it fully credited defendant for its $1,500 payment when it credited that amount against the commitment fee. On defendant's motion for summary judgment, Special Term declined to grant summary judgment, concluding, in effect, that the intent of the parties could not be gleaned from the ambiguous writings that evidenced the agreement without resort to parol evidence. On defendant's appeal, this court declined to grant summary judgment to either party, although plaintiff contended here that the relevant writings were unambiguous and that summary judgment should be granted in its favor (see CPLR 3212, subd [b]). While our decision denying summary judgment is not, of course, dispositive of the instant motion, it is most significant. By that decision we not only necessarily determined that there was no potentially predominant common issue of law concerning the interpretation of contractual provisions without the need to resort to parol evidence (see *Mallard Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285), but also that the record revealed "facts sufficient to require a trial of [an] issue of fact" (CPLR 3212, subd [b]), i.e., whether the parties intended that the commitment fee was an "expense of the loan" against which the amount of the commitment fee was to be properly credited. The issue thus posed is whether the trial of this ultimate issue of fact will necessarily engender individual questions of fact over which questions of law or fact common to the class will not predominate (see CPLR 901, subd a, par 2; *Strauss v Long Is. Sports,* 60 AD2d 501, 507). In resolving this issue, the central inquiry is not a mechanical one of whether "common" questions "outweigh" "individual" questions. Rather, it is "'whether the use of a class action will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated"' [citations omitted]" *(Friar v Vanguard Holding Corp.,* 78

AD2d 83, 97). My examination of the record convinces me that plaintiff has not met its burden of establishing that those ends would be accomplished if this action were to proceed as a class action. As more fully set forth below, this is not a case where, from the circumstances surrounding the class claim, inferences may readily be drawn which may then be properly applied to substantially resolve the issue of defendant's liability to other members of the class (see *Strauss v Long Is. Sports,* 60 AD2d 501, 508, *supra).* By way of illustration, the facts and circumstances of the case at bar differ markedly from those present in *Friar v Vanguard Holding Corp.* (78 AD2d 83, *supra),* relied upon by my colleagues in the majority. In that case, the plaintiff contracted to sell his home subject to the purchaser's obtaining a mortgage loan commitment. The commitment was subsequently issued by the defendant, but in the period between the execution of the contract of sale and the defendant's issuance of the commitment, a statute was enacted which imposed an additional mortgage recording tax upon mortgage transactions. The statute provided that, with respect to mortgages such as the one in question, the lender was obliged to pay the tax and could not pass it on to the borrower "directly or indirectly" (Tax Law, § 253, subd 1-a, par [a]). At the closing, notwithstanding this statute, the defendant refused to close the loan unless the plaintiff seller effectively paid part of the tax by permitting a sum to be deducted from the amount otherwise payable to him. In *Friar* we held that plaintiff's complaint seeking, among other things, recovery of the sum so deducted, stated a cause of action for moneys had and received based on economic duress and that the action was properly maintained as a class action on behalf of other sellers who, at the closing, effectively paid the tax in question to the defendant as a result of mistake, misrepresentation or economic duress. Rejecting the defendant's claim that the "predominance" requirement had not been met because other sellers might have paid the tax under circumstances which would justify defendant's retention of such payments, the examination of which would require individual trials, the court stated as follows: "The gravamen of the instant class action claim against Vanguard is its allegedly wrongful imposition upon sellers of its own obligation to pay the additional mortgage recording tax despite the Legislature's declaration that the tax was to be paid by the lender [citation omitted]. Vanguard has admitted that this practice was part of its business policy despite the fact that the Attorney-General had informed it that the practice was 'an unwarranted attempt, to circumvent the clear statutory directive.' * * * [T]he offer from Vanguard realistically broached no refusal. Either plaintiff paid the mortgage tax that the law obligated Vanguard to pay or the title closing would be terminated without the seller receiving the sums due from the sale, leaving him with the prospect of suing the purchasers (and Vanguard, if he could construct a cognizable theory). While plaintiff's situation was specially dramatic because the purchasers' belongings already had been moved into his house, the scenario is not unfamiliar. When residential property closes, the seller generally requires the proceeds to close on other premises and either has already moved or is about to do so. The buyer's position is similar. Such circumstances demonstrate the fallacy of any contention that each seller who may have succumbed to Vanguard's pressure or blandishments did so after engaging in a contest of wills which would require a separate trial for each claim. In the absence of misrepresentation by the defendant or mistake by the seller, each of which might constitute a basis for the recovery of the money paid over (see *Miller* v *Schloss,* 218 NY 400, 408, *supra;* cf. CPLR 3005; 13 Williston, Contracts [3d ed], § 1574), it is almost impossible to envisage circumstances in which a seller would willingly confer a financial gratuity upon the buyer's lender." (See *Friar v Vanguard Holding Corp.,* 78 AD2d 83, 97-98, *supra.)* In contrast, the record in this case does not

suggest any common pattern similar to that found in *Friar* from the existence of which it may be inferred that the determination of defendant's liability, if any, to members of the class would be made properly and with judicial economy if this action were to proceed as a class action. In *Friar (supra,* p 98), the command of the relevant statute (Tax Law, § 253, subd 1-a) was so clear and the transaction in which the plaintiff was involved could be so readily inferred to be reflective of the transactions involving other members of the class that we could conclude that, with respect to all potential class members, "[t]he entire matter of liability [could] be easily disposed of once it is determined how Vanguard passed the tax on and why." In contrast, the gravamen of the complaint at bar is not that defendant acted in violation of a statute governing its conduct with respect to all potential class members, but that defendant breached a contract to which only plaintiff and defendant were parties. Moreover, unlike in other contract cases where class actions have been permitted (see, e.g., *Vickers v Home Fed. Sav. & Loan Assn. of East Rochester,* 56 AD2d 62; *Guadagno v Diamond Tours & Travel,* 89 Misc 2d 697), the terms of the contract in this case are susceptible to differing reasonable interpretations and have been effectively determined to be sufficiently ambiguous to require the resort to parol evidence in order to determine the nature of the agreement between the parties. More importantly, the nature of that parol evidence will differ in individual cases to the degree that prosecution of this action as a class action will not result in judicial economy or promote proper uniform decisions. Although there appear to be at least 90 potential class members whose transactions involved the forms identical to those involved in plaintiff's transaction with defendant, it is uncontroverted that only 18 of them were, like plaintiff, borrowers under the JDA program. It is also uncontroverted that with respect to most conventional commercial mortgage transactions involving defendant, the initiating contract and subsequent contract discussions were had between defendant and the mortgagor or its attorney. However, with respect to JDA program mortgages, defendant had no contact with the mortgagor until the time that a commitment was issued. Indeed, the contract between the plaintiff and defendant was initiated upon a referral by an officer of another bank, according to that officer's affidavit, which was submitted by defendant in opposition to the motion. Moreover, it was that officer's usual practice to explain the costs of the mortgage, including the nature of the commitment fee, to potential JDA mortgagors. From this it is apparent that the nature of the admissible evidence will differ substantially as between cases of JDA borrowers and those of other borrowers. There are other differences between plaintiff's transaction and those of other potential class members which suggest that a class action will not avoid numerous individualized fact determinations and will not promote uniformity of result among similarly situated parties. In eight transactions, specific adjustments were made at closing to the commitment fee in accordance with defendant's interpretation of the nature of that fee. In two of those transactions and five others, letters were exchanged between defendant and the mortgagors' attorneys indicating negotiations between them relative to the terms, conditions and expenses of the loan. In one of those transactions and 11 others, the commitment fee paid also included legal and appraisal fees which, in plaintiff's transaction, were both listed as separate fees. In three of those transactions and 10 others, the mortgagors had had extensive prior business dealings with defendant and were allegedly familiar with the defendant's interpretation of the nature of the commitment fee. In two of those transactions and eight others, the mortgagors were represented by attorneys who had extensive business dealings with defendant and were also allegedly familiar with that interpretation. Finally, it is most significant that three of the four sets of forms

which are not identical to the set of forms involved in plaintiff's transaction, but which were implicated in this action under Special Term's definition of the class, show a "processing fee" in addition to a "commitment fee". Since the determinative issue in this case is the correctness of plaintiff's contention that the "commitment fee" is nothing more than a kind of processing fee, the fact that these forms make specific separate reference to a "processing fee" and a "commitment fee" is important evidence, not present in plaintiff's case, that, at least with respect to those forms, the "commitment fee" was not a "processing fee". For this and other reasons, judicial economy and proper uniformity of result will not be promoted by a class action involving both potential class members whose transactions involved the identical forms used in plaintiff's transaction and those whose transactions did not. The further fact that two of the forms which represent the latter class of transactions show a "processing fee" less than the "commitment fee", while one of those forms shows a "processing fee" equal to the "commitment fee", tends to suggest that, in some cases, the commitment fee may have been merely a processing fee and in some cases it was not. This is further reason to conclude that common questions do not predominate here, even with respect to the transactions involving forms identical to those employed in plaintiff's transaction. Notwithstanding the apparent fact that the parol evidence will differ markedly from case to case and our prior affirmance in this case, with its implicit conclusion that parol evidence is necessary to determine the intent of the parties, the majority concludes that common questions predominate because (1) with respect to JDA mortgages, there were no negotiations *between the parties to the mortgage* concerning the mortgage closing costs, (2) with respect to other mortgages, defendant does not claim that "mortgage closing costs were separately negotiated with each borrower", although defendant does assert that "commitment fees were 'often discussed' during loan negotiations", and (3) even if there were negotiations, "only two interpretations of the language at issue are available" and once "its meaning has been established at trial, the most significant issue in all of the cases will have been decided." With respect to the first ground, even if there were no negotiations between the parties to JDA mortgages, it is undisputed that Donald Gallagher, an officer of Chemical Bank who referred potential JDA mortgagees to defendant from 1975 through 1978, generally explained to potential JDA mortgagees that, as defendant contends, the commitment fee was a nonrefundable "additional expense of the loan." Thus, even if there were no negotiations between the parties with respect to JDA mortgage commitments, it seems to me that there will be no dearth of parol evidence in this case with respect to the nature of the commitment fee assessed with respect to such mortgages. With respect to the second ground, it seems to me that even if there were not separate "negotiations" of the closing costs, the uncontroverted allegations that there were in many cases discussions of closing costs or implicit understandings from other dealings that the commitment fee was a nonrefundable "expense of the loan", are sufficient to indicate that there will also be parol evidence concerning the nature of the commitment fee assessed with respect to non-JDA mortgages. In any event, regardless of whether there were any discussions of the nature of the commitment fee before the mortgage transactions occurred, it is beyond dispute that the conduct of the parties during and subsequent to the transaction is admissible evidence of the meaning of their agreement (see 4 Williston, Contracts [3d ed], § 623). Some of the mortgage commitments implicated in his case by the order granting plaintiff's motion for class action certification date as far back as October 1, 1973. However, defendant's president has alleged, without contradiction, that: "Aside from the instant lawsuit, there have been no demands from any mortgagor for a refund of the commitment fee and no lawsuits brought by any

mortgagor for refunds or for breach of contract or misrepresentation regarding the commitment fee."[*] Thus, unlike plaintiff, every other potential member of the class, as of the time of this motion, has acquiesced for some period of time in the defendant's interpretation of the commitment agreement. Presumably, some of them have done so for a period of upward of seven years. Thus, it seems to me that in the case of every potential member of the class, except plaintiff, an individualized determination will have to be made in which that potential member's evidence that the agreement has the meaning that plaintiff ascribes to it will be weighed against, not only whatever other evidence of the parties' words and deeds before and during the transaction which defendant will introduce, but also evidence that the potential member acquiesced in defendant's interpretation of the agreement during, and for a significant time after, the transaction. In my view, this individualized determination, in order to achieve a just and proper result, will have to be arrived at by a procedure that so resembles a full-scale trial that a class action is simply unwarranted. With respect to the third ground invoked by the majority, I do no disagree that there are only two interpretations of the language at issue. However, I do disagree with the majority's implication that the language has only one correct interpretation that applies in the cases of all potential class members. As indicated, although there is some identical language in all of the commitment agreements, the language of all the commitment agreements is not identical and, in some cases, is significantly different. Nevertheless, even assuming that all the commitment agreements implicated in this case were identical in language, the ambiguous language in question must be interpreted in light of the parties' relevant words and deeds before, during and after the transaction, and there is every reason to believe that these will vary significantly from case to case, particularly when the circumstances of plaintiff's case are compared to those of other potential class members. In other words, the intent of the parties to one transaction cannot be presumed, in this case, to be the intent of the parties to another. The mere fact that the defendant does not contend that the meaning of the language at issue varied from transaction to transaction is not dispositive in this respect, for it is fundamental that the defendant's subjective interpretation of the disputed language is not the ultimate fact to be determined. As Williston has expressed this fundamental principle: "It is useless to talk of the 'meaning' of a contract or agreement unless it is known whose meaning is sought; and this inquiry cannot be disposed of by the answer — the meaning of the parties. The inadequacy of such an answer is obvious. The parties may not have had the same intention. Furthermore, courts, after asserting that what they are seeking is the intention of the parties, generally add that this intention can be proved only by what they say and do. In other words, it is not the intention of the parties that is material, but the meaning that the court gives to their manifestations." (4 Williston, Contracts [3d ed], § 603, pp 334-339.) This record reveals that the evidence of what the parties to the transactions involved in this class action said and did will so vary from case to case that the action "is likely to 'splinter into individual trials' [citation omitted]" *(Strauss v Long Is. Sports,* 60 AD2d 501, 507, *supra).* I fully agree that, in general, "the fact that questions peculiar to each individual may

---

[*] This uncontroverted allegation raises a significant doubt as to whether plaintiff has established, as required, that "the class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable" (CPLR 901, subd a, par 1). This is particularly so since those borrowers who believe that their contract rights were violated by defendant are presumably well aware of that violation by now. " 'If a class of interested litigants is not already in existence the court should not go out of its way to create one without good reason' [citations omitted]" *(Strauss v Long Is. Sports,* 60 AD2d 501, 511).

remain after resolution of the common questions is not fatal to the class action" *(Friar v Vanguard Holding Corp.*, 78 AD2d 83, 98, *supra)*. Indeed, in this case after the "common question" at issue is resolved, questions peculiar to each individual will be relatively simple to resolve. However, because I believe that the "common" and most important question in this case may be justly determined only after what will amount to a full-scale trial on that issue has been conducted with respect to the claim of each potential class member, I respectfully dissent.