754 A.2d 1188

SUSAN KAUFMAN, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF–RESPONDENT, v. I–STAT CORPORATION; WILLIAM P. MOFFITT; LIONEL N. STERLING; IMANTS R. LAUKS AND MATTHIAS PLUM, JR., DEFENDANTS–APPELLANTS.

Argued May 1, 2000—Decided July 27, 2000.

96

Lawrence M. Rolnick, argued the cause for appellants (Lowen-stein Sandler, attorneys; Mr. Rolnick and Edward T. Dartley, on the brief).

*William C. Fredericks*, a member of the New York Bar, argued the cause for respondent (*Miles M. Tepper*, attorney).

The opinion of the Court was delivered by

LaVECCHIA, J.

This appeal presents the question whether a class of plaintiffs in a common-law action for fraud can prove the element of reliance through the presumption of a fraud on the market. The theory of fraud on the market, as described by the United States Supreme Court in *Basic Inc. v. Levinson*, 485 *U.S.* 224, 108 *S.Ct.* 978, 99 *L.Ed.*2d 194 (1988), allows plaintiffs to bring class actions under federal securities-fraud law by excusing those plaintiffs from the burden of proving individual reliance. Instead, plaintiffs may establish the reliance element of their claims by showing that they purchased securities in the secondary markets at attractive prices that had been artificially affected by an issuer's misrepresentations and omissions.

Plaintiff Susan Kaufman held shares of defendant i-Stat Corporation ("i-Stat") over a period during which i-Stat allegedly misrepresented certain financial matters and the misrepresentations were discovered and publicized. The misrepresentations were never made to Kaufman by i-Stat or any intermediary. Kaufman relied on the price of the stock in her decisions, and now contends that, because i-Stat's misrepresentations were reflected in the share price, she can make out claims for common-law fraud and negligent misrepresentation on the basis of the share price alone.

Even though the theory of fraud on the market has a place in the securities law of this nation, it is a stranger to New Jersey's securities laws. It is also not consistent with the current requirements for a common-law action for fraud in New Jersey. Use of the fraud-on-the-market theory is not the equivalent of proof of indirect reliance that is required minimally in a common-law fraud action. Because we discern no compelling reason to deviate from our current standard of proof for the reliance element in a common-law fraud action, and because we, like many commenta-

tors, cast a jaundiced eye on the worth of the fraud-on-the-market theory, we decline to expand our common law to permit its use. Accordingly, we reverse the judgment of the Appellate Division and reinstate the trial court's dismissal of plaintiff's fraud claim.

I.

This matter comes before the Court as a result of the Law Division's grant of summary judgment for the defendants. Accordingly, we give the plaintiff the benefit of every positive inference to be drawn from the facts as she has pled them. *See Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995). In that light, we thus consider the facts.

i–Stat is a public New Jersey corporation that manufactures and markets diagnostic blood-analysis equipment designed to assist medical professionals at the point of patient care. Specifically, the company makes a hand-held blood analyzer and cartridges to test individual patients. The corporation's stock is traded on the NASDAQ National Market System. On October 31, 1995, during the events at issue in this action, i-Stat had 11,083,421 shares of common stock issued and outstanding.

On May 9, 1995, i-Stat announced its financial results for the first fiscal quarter of 1995, ending March 31. The company reported net sales of $3,359,000, as compared to reported net sales of $1,651,000 for the same period in the previous year. The company reported a net loss of $6,531,000 ($0.59 per share) for the first quarter as compared with a net loss of $6,056,000 ($0.55 per share) for the same period in the prior year. Kaufman alleges that, to produce the improved sales figures, i-Stat[1] misrepresented acceptance of the company's products to the public by "re-

---

[1] In addition to the corporation, Kaufman named a number of individual defendants. William P. Moffitt is the President and Chief Executive Officer, Imants R. Lauks is Executive Vice President and Chief Technology Officer, and Lionel N. Sterling and Matthias Plum, Jr., are members of the company's Board of Directors.

port[ing] sales that were not, in fact, true sales, but were, instead, loans on a trial basis." For example, i-Stat allegedly reported "sales" to certain hospitals without disclosing that the "sales" were induced by "charitable donations" from interested third parties to the purchasing hospitals. These sales practices resulted in an exaggerated representation of the company's sales and degree of market acceptance of its products.

On May 22, 1995, Susan Kaufman purchased one hundred shares of i-Stat common stock at 21 ¾, a total investment of $2175. Meanwhile, on that date, *Forbes* magazine reported that a medical investment newsletter believed i-Stat was experiencing difficulties and that its products were not economical. On June 21, 1995, an article in *The Financial Post,* a Canadian financial publication, reported "the expected profitability and growth of the Company," citing an interview with defendant Imants Lauks. On September 21, 1995, i-Stat reached its all-time high, trading at 43 ¾.

The bubble began to burst on January 28, 1996. On that date, *The New York Times* reported that Daniel R. Frank, manager of the Fidelity Advisor Strategic Opportunities Fund, whose successor is still the largest institutional holder of i-Stat, had made charitable contributions to hospitals to enable them to obtain i-Stat's diagnostic equipment.

Then, on March 19, 1996, *The Wall Street Journal* reported that the Securities and Exchange Commission ("SEC") was investigating i-Stat's business. The article revealed that some of i-Stat's "sales" had been loans of the products to hospitals on a trial basis rather than actual sales. i-Stat responded with a press release confirming the SEC's investigation and inquiry into its sales procedures. On that same day, i-Stat's shares, which had been declining, tumbled 2½ to 28 ¾. Two million shares of i-Stat, nearly one sixth of the shares outstanding on that date, traded on March 19.

On May 20, 1996, Kaufman sold 50 shares at 20 ¼. On June 19, she filed suit as putative class representative on behalf of all purchasers of i-Stat common stock between May 9, 1995, and

March 19, 1996, excluding the officers and directors of the company. Kaufman alleged common-law fraud and negligent misrepresentation, contending that i-Stat's deliberately false and misleading statements regarding its financial status and deceptive sales practices inflated the stock price during the class period. Kaufman also alleged that i-Stat's officers and directors illegally received over $2.9 million from insider trading during the class period.

i–Stat filed an answer alleging various affirmative defenses. Both parties stipulated to the following: (1) Kaufman did not "actually or directly receive or rely on any communication containing any misrepresentation ... nor ... actually receive or rely on any communication which omitted material facts[;]" (2) Kaufman purchased her stock through a brokerage firm and did not directly receive or rely on any communication from the brokerage firm concerning the i-Stat purchase; and (3) Kaufman "relied exclusively on the integrity of the market price of i-Stat stock at the time of her purchase." Therefore, Kaufman's satisfaction of the reliance element of the common-law fraud and negligent–misrepresentation claims depends entirely on the fraud-on-the-market theory.

i–Stat moved for summary judgment on the ground that Kaufman failed to state a cause of action in fraud or in negligent misrepresentation because she could not satisfy the actual reliance requirement in each. The trial court granted the motion, dismissing Kaufman's claims with prejudice. Although the court agreed with the fraud-on-the-market theory Justice Blackmun espoused in *Basic, supra,* it rejected the theory as a substitute for reliance, believing it would be inappropriate for a trial court to expand the common law of New Jersey. The court concluded that the issue was better addressed by an appellate court or the Legislature.

On appeal, the Appellate Division reversed the dismissal of plaintiff's complaint on the common-law-fraud claim but affirmed the dismissal of the negligent-misrepresentation claim. *Kaufman v. i-Stat Corp.,* 324 *N.J.Super.* 344, 348, 735 *A.2d* 606 (App.Div. 1999). The court concluded that plaintiff's reliance on the integri-

ty of the market price of the security was sufficient to satisfy the reliance requirement of a common-law-fraud claim when the security was inflated artificially by the corporation's deliberate false statements, but declined to extend this form of proof of reliance to a negligent-misrepresentation claim, citing public policy considerations in favor of a more limited scope of liability for negligent communication of fraudulent misrepresentations. Because the Appellate Division broke new ground in allowing the fraud-on-the-market theory to serve as proof of reliance in a common-law-fraud cause of action, we detail the court's reasoning below.

The court began its analysis by noting that only the reliance element was at issue in this common-law-fraud claim and that New Jersey already allows proof of indirect reliance to satisfy this element. *Id.* at 349, 735 *A.*2d 606. Indirect reliance has also been adopted by the *Restatement (Second) of Torts* for situations involving reliance by party B on a false representation initially made to party A who the maker knew or had reason to expect would communicate the information to party B such that the information would influence party B's conduct in a transaction. *Ibid.* (citing *Restatement (Second) of Torts* § 533 (1977)).

Using a similar analysis, reasoned the Appellate Division, federal courts have permitted the reliance element of a securities-fraud claim under section 10(b) of the Securities Exchange Act of 1934 to be satisfied by reliance on the market price of the security. *Id.* at 350–51, 735 A.2d 606 (citing *Basic, supra* ). Under the fraud-on-the-market theory, the market price reflects the value of the stock to the investor based on all of the information available at the time. Therefore, an investor relying on a price that is actually based on misrepresentations is entitled to recover damages when he or she trades at a loss. *Id.* at 350, 735 *A.*2d 606. The Appellate Division concluded that the reasoning of the federal securities law cases should apply to common-law-fraud claims for securities fraud because "the reliance element of a securities fraud claim under these regulatory provisions is substantially the same as in a common law fraud action." *Id.* at 351, 735 *A.*2d 606.

The Appellate Division acknowledged that no other state appellate court had permitted the fraud-on-the-market theory to satisfy the reliance requirement of common-law fraud, but found the reasoning of the dissenting justices of the California Supreme Court in *Mirkin v. Wasserman,* 5 *Cal.*4th 1082, 23 *Cal.Rptr.*2d 101, 858 *P.*2d 568, 584–95 (1993) (Kennard & Mosk, JJ., concurring in part and dissenting in part), to be persuasive on the issue. The Appellate Division determined that that dissent more correctly interpreted principles of indirect reliance articulated in *Basic* and section 533 of the *Restatement (Second) of Torts,* and provided victims of securities fraud with an appropriate remedy under state law. *Kaufman, supra,* 324 *N.J.Super.* at 352, 735 *A.*2d 606. The court rejected i-Stat's argument that plaintiff already had an adequate remedy under federal securities law because Congress enacted the Securities Exchange Act of 1934 to supplement, rather than preempt, existing remedies. *Id.* at 353, 735 *A.*2d 606.

In examining the negligent-misrepresentation claim, the Appellate Division concluded differently. The court acknowledged that the measure of liability for negligent misrepresentation " 'involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' " *Ibid.* (quoting *Goldberg v. Housing Auth.,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)). In *H. Rosenblum, Inc. v. Adler,* 93 *N.J.* 324, 352, 461 *A.*2d 138 (1983), this Court imposed liability on an independent accountant who issued financial statements on which reasonably foreseeable recipients relied for business purposes. Given the facts in that matter, the Court did not reach the issue of claims by individuals who do not receive audited statements from the company, like purchasers of the corporation's stock. *Id.* at 353, 461 *A.*2d 138. Later, the Court clarified that limited liability was necessary in a negligent–misrepresentation claim to avoid "potentially unlimited liability." *Petrillo v. Bachenberg,* 139 *N.J.* 472, 484, 655 *A.*2d 1354 (1995), quoted in *Kaufman, supra,* 324 *N.J.Super.* at 355, 735 *A.*2d 606. The Appellate Division therefore believed it was constrained by the precedent of *Rosenblum,* and declined to broaden the scope of liability for negligent misrepresentation. *Ibid.* The court rea-

soned that this result complied with the public policy of the *Restatement (Second) of Torts* § 552, as well as Rule 10b–5 of the Securities Exchange Act of 1934, which requires scienter as an element of fraud. *Id.* at 355–56, 461 *A.*2d 138. Similarly, the *Mirkin* dissent declined to extend liability under a negligent misrepresentation cause of action where investors indirectly relied on the market price rather than on direct misstatements. *Id.* at 356, 461 *A.*2d 138 (citing *Mirkin, supra,* 23 *Cal.Rptr.*2d 101, 858 *P.*2d at 595 (Kennard & Mosk, JJ., concurring in part and dissenting in part)).

We granted certification. 162 *N.J.* 489, 744 *A.*2d 1211 (1999).

## II.

Assuming the allegations made by plaintiff Susan Kaufman on behalf of a putative class are correct, and because this is an appeal of a grant of summary judgment we give her the benefit of every inference that they are, then the misrepresentations and omissions made by the management of i-Stat corporation caused her to lose money. If she can prove that her loss resulted from an act prohibited under Section 10(b) of the Securities Exchange Act of 1934, 15 *U.S.C.A.* § 78j(b), and Rule 10b–5 promulgated thereunder, 17 *C.F.R.* § 240.10b–5, she is entitled to compensation for that loss.

Rule 10b–5 makes it

unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The misdeeds that plaintiff alleges i-Stat to have committed, if proven, clearly fall within the ambit of the Rule. Many actions

based on similar claims, some using the fraud-on-the-market theory, have been brought before the federal courts over the last sixty years. But since 1995, plaintiffs in these actions have increasingly turned to state courts. *See* SEC, Office of the General Counsel, Report to The President and The Congress on The First Year of Practice under The Private Securities Litigation Reform Act of 1995 (April 1997).

The change has come about neither because state courts have greater expertise in these matters nor because they are more convenient. The impetus for these state court filings was provided by Congress' passage of the Private Securities Litigation Reform Act of 1995, Pub. L.No. 104–67, 109 *Stat.* 737 ("PSLRA"). Congress enacted the PSLRA to reduce or eliminate class-action strike suits filed by investors when the price of a stock declined. PSLRA's provisions have made litigating such cases much more difficult for plaintiffs.

Among the restrictions imposed was a stay of discovery during the pendency of any motion to dismiss, Congress having found that plaintiffs often used this period as a fishing expedition to discover information that would underlie the suit. 15 *U.S.C.A.* § 78u–4(b)(3). Similarly, the level of specificity required in pleadings was raised to a "strong inference of fraud," so that any material misstatement has to be identified, and the information about, or belief in, any material omission stated with particularity. *Id.* § 78u–4(b)(1), (2). The plaintiff must prove that the misstatement led to the loss. *Id.* § 78u–4(b)(4). Forward-looking statements are protected by a safe-harbor provision. 15 *U.S.C.A.* § 78u–4(g). Class certification is more difficult as a result, and there are penalties for abusive litigation. *Id.* § 78u–4(a), (c). The PSLRA also has reduced plaintiffs' potential recovery, limiting damages to

> the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90–day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

> [15 *U.S.C.A.* § 78u–4(e)(1).]

These changes have led plaintiffs to attempt to "avoid some of the new provisions of the [PSLRA] by seeking procedural advantages available in state courts." Sara Beth Brody & Ted F. Angus, *Securities Litigation in State Court,* 1070 WESTLAW PLI/Corp 413 (1998). The result has been "a significant forum shift in class action securities fraud litigation, from federal to state court." Michael A. Perino, *Fraud and Federalism: Preempting Private State Securities Fraud Causes of Action* 50 *Stan. L.Rev.* 273, 273 (1998). "Plaintiffs are filing 'weaker' cases in state court, i.e., cases in which the plaintiffs' attorney has a lower expectation that the complaint will survive a motion to dismiss under the act's 'strong inference of fraud' pleading standard [because] in state court proceedings . . . the 'strong inference of fraud' standard does not apply." *Id.* at 278, 315.

Most of those cases newly brought in state court have been, as this one is, substitutes for Rule 10b–5 actions.[2] To maintain those actions' viability, the plaintiffs bringing them have sought to have the courts hearing them incorporate the doctrine of fraud on the market into the common law of their respective states. Plaintiff, however, has cited no case in which a state court ruling on its common law has accepted the invitation. Defendants, by contrast, have found several cases declining to allow the fraud-on-the-market theory to establish reliance at common law. *See Mirkin v. Wasserman,* 5 *Cal.*4th 1082, 23 *Cal.Rptr.*2d 101, 858 *P.*2d 568, 580 (1993) (declining to expand common-law cause of action when procedurally controlled state statutory remedy, amenable to fraud-on-the-market presumption, already available); *Malone v. Brincat,* 722 *A.*2d 5 (Del.1998) (declining to expand common-law cause of action when federal statutory remedy available); *Kahler v. E.F. Hutton Co.,* 558 *So.*2d 144 (Fla.Dist.Ct.App.1990); *Constantine v. Miller Indus.,* No. E1999–01575–COA–R3–CV, 2000 *WL* 336663 (Tenn.Ct.App. March 31, 2000). *See also Rosenthal v. Dean*

---

[2] Plaintiff has acknowledged that she filed this action before the statute of limitations for a federal action had expired. Her reasons for filing her claim in state, instead of federal, court have not been revealed to us in this record.

*Witter Reynolds, Inc.*, 908 *P.*2d 1095, 1104 (Colo.1995) (rejecting related doctrine of "fraud created the market" and requiring actual reliance on substance of misrepresentation). Our research reveals that one court has accepted the theory in dictum, but no claim based directly on the theory appears to have been adjudicated in the jurisdiction. *Allyn v. Wortman*, 725 *So.*2d 94 (Miss. 1998).

The federal courts with jurisdiction in New Jersey have rejected the idea that fraud on the market can create a common-law action for fraud. Thus, the Third Circuit, in one of the landmark decisions on fraud on the market, *Peil v. Speiser*, 806 *F.*2d 1154 (3d Cir.1986), on which the Supreme Court relied extensively in *Basic*, declined to allow a state-law claim to proceed because "no state courts have adopted the theory, and thus direct reliance remains a requirement of a common law securities fraud claim." *Id.* at 1163 (adjudicating Pennsylvania-law claim). The District of New Jersey has also rejected the invitation to expand the common law of fraud. *See Weikel v. Tower Semiconductor Ltd.*, 183 *F.R.D.* 377, 400 n. 12 (D.N.J.1998); *Easton & Co. v. Mutual Benefit Life Ins. Co.*, 1993 *WL* 89146, at *6 (D.N.J.); *Cammer v. Bloom*, 711 *F.Supp.* 1264, 1298 (D.N.J.1989); *In re ORFA Sec. Litig.*, 654 *F.Supp.* 1449, 1460 (D.N.J.1987) ("There does [sic] not appear to be any common law exceptions to the requirement of individual reliance (analogous to the judicially created Rule 10b–5 exceptions)"). *But see In re Zenith Labs. Sec. Litig.*, 1993 *WL* 260683 (D.N.J.) (predicting that New Jersey Supreme Court would allow fraud-on-the-market proof of negligent misrepresentation and allowing negligent-misrepresentation claims to survive summary judgment).

The many state-law class actions for securities fraud triggered further federal reform legislation, the Securities Litigation Uniform Standards Act of 1998, Pub.L. No. 105–353, 112 *Stat.* 3227, (codified in scattered sections of 15 *U.S.C.A.* §§ 77–80) ("SLU-SA"). In his signing statement on the bill, President Clinton noted concerns that PSLRA's protections had not taken full effect

because "firms [were] not using the Federal safe harbor for forward-looking statements because they fear[ed] State court litigation over the same representations that are protected under Federal law [and] State actions [were] being used to achieve an 'end run' around [PSLRA's] stay of discovery." 1998 *U.S.C.C.A.N.* 768. Now, SLUSA provides that any securities action brought on behalf of a class of more than fifty individual investors, whether arising under federal, common, or blue-sky law, must be brought in federal court. 15 *U.S.C.A.* § 77b. Since the common law of fraud covers areas other than securities, then, the plaintiffs in this case are asking this Court to expand the common law, potentially beyond the arena of securities, in an action of a sort that Congress substantially has barred our courts from hearing in the future.

To some degree, SLUSA allows the Court to consider this claim free from the threat that securities-fraud plaintiffs will bring actions in New Jersey with only the most tenuous of connections here because this is the only state that allows them to do so. Nevertheless, the excepted plaintiffs remaining under SLUSA, namely state or municipal entities, state pension funds, or combinations of the same, could still bring a significant amount of litigation here. Further, SLUSA excepts classes of fewer than fifty plaintiffs.

Federalism permits the state and national governments to resolve similar matters in different ways. *See State v. Preciose*, 129 *N.J.* 451, 475, 609 *A*.2d 1280 (1992) ("considerations of federalism dictate that our state courts should enforce New Jersey's post-conviction rules without attempting to emulate the federal habeas decisions"). A court's decision to follow its own lead, however, ought to be firmly grounded in public policy. *Cf. State v. Hempele*, 120 *N.J.* 182, 229, 576 *A*.2d 793 (1990) (Garibaldi, J., dissenting) (observing that "under principles of federalism, there is no sound public policy that would justify" departure from federal approach in Fourth Amendment case). The question in this matter is whether the public interest in the development of our

common law of fraud is served by plaintiff's contention that the fraud-on-the-market theory should be permitted to be used in New Jersey despite a contrary conclusion in the many other jurisdictions that have considered the same question.

## III.

### A.

Plaintiff characterizes the fraud-on-the-market theory as no more than a reasonable application of indirect reliance principles. Indirect reliance allows a plaintiff to prove a fraud action when he or she heard a statement not from the party that defrauded him or her but from that party's agent or from someone to whom the party communicated the false statement with the intention that the victim hear it, rely on it, and act to his or her detriment. *See Judson v. Peoples Bank & Trust Co.*, 25 *N.J.* 17, 27, 134 *A.2d* 761 (1957); *Metric Inv., Inc. v. Patterson*, 101 *N.J.Super.* 301, 306–07, 244 *A.2d* 311 (App.Div.1968). The Appellate Division accepted plaintiff's argument, noting that the fraud-on-the-market theory of federal securities fraud law was "[b]ased on a similar analysis," and holding "that indirect reliance in the form of reliance on the integrity of the market price for a corporate security which has been artificially inflated by the corporation's deliberate false statements concerning its financial condition may satisfy the reliance element of a common law fraud action." *Kaufman, supra,* 324 *N.J.Super.* at 350, 354, 735 *A.2d* 606.

Defendants note this shift from a chain of communicated false statements, however indirectly passed along from one to another, and argue that this Court's standard for reliance, even indirect reliance, requires that the plaintiff have actually relied on the misstatement, i.e., that the plaintiff actually received and considered the misstatement or omission, however indirectly uttered, before he or she completed the transaction. Defendant argues that until the decision below, "no New Jersey state court [had]

stretched the limits of common law liability to encompass a situation [in which] plaintiff never actually received or relied on any of the alleged misstatements."

 We agree with defendants. The actual receipt and consideration of any misstatement remains central to the case of any plaintiff seeking to prove that he or she was deceived by the misstatement or omission. The element of reliance is the same for fraud and negligent misrepresentation. *Compare Rosenblum, supra,* 93 *N.J.* at 334, 461 *A.*2d 138 ("Negligent misrepresentation is ... [a]n incorrect statement, negligently made and justifiably relied on, [and] may be the basis for recovery of damages for economic loss ... sustained as a consequence of that reliance.") *with Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 610, 691 *A.*2d 350 (1997) ("The five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."). *See also Kuhnel v. CNA Ins. Cos.,* 322 *N.J.Super.* 568, 581, 731 *A.*2d 564 (App.Div.1999), *cert. denied,* 163 *N.J.* 12, 746 *A.*2d 458 (2000) (affirming trial court's dismissal of fraud and negligent-misrepresentation claims for plaintiffs' failure to show detrimental reliance).

 With regard to a negligent-misrepresentation claim, in *Rosenblum, supra,* while finding that an accounting firm could be liable to someone relying on its statements, even though that party was not its client, we nevertheless held that plaintiffs alleging deceit "would have to establish that they ... received ... the statements ... that they relied on the statements and that the misstatements therein ... were a proximate cause of the ... damage." *Id.* at 350, 461 *A.*2d 138 (citations omitted). We laid out plaintiff's burden this way to retain the concept of reliance defined in *Judson, Metric,* and their antecedents and at the same time avoid potentially unlimited liability for the makers of the statements to parties other than those to whom the statements

were made. *Petrillo v. Bachenberg,* 139 *N.J.* 472, 484, 655 *A.*2d 1354 (1995).

Because negligent misrepresentation does not require scienter as an element, it is easier to prove than fraud. The Appellate Division correctly reasoned that, because the Rule 10b–5 action requires a plaintiff to prove scienter, expanding fraud on the market to cover a tort without scienter would be inconsistent with the theory of recovery. *Kaufman, supra,* 324 *N.J.Super.* at 355–56, 735 *A.*2d 606. Nevertheless, our law of indirect reliance, even though most recently clarified in negligent-misrepresentation cases, is the same in fraud cases, the element of reliance being the same in both.

## B.

Other states similarly have held that the doctrine of indirect reliance requires that the plaintiff have relied on the substance of the allegedly fraudulent claim. The Florida District Court of Appeals, which has rejected the fraud-on-the-market theory, *see Kahler, supra,* distinguished its acceptance of indirect reliance because, with indirect reliance, the actual substance of the misrepresentation is communicated to the plaintiff at the end of a series of communications begun by the defendant with the intent that the plaintiff will hear the misrepresentation. *See Joseph v. Norman LaPorte Realty, Inc.,* 508 *So.*2d 496 (Fla.Dist.Ct.App.1987).

Similarly, the California Court of Appeal recently held, relying on *Mirkin, supra,* "[i]t must be shown the defendant made misrepresentations or omissions directly to one victim who then repeated the misrepresentations or omissions to another who thus was an indirect recipient of the defendant's communications." *Gawara v. United States Brass Corp.,* 63 *Cal.App.*4th 1341, 74 *Cal.Rptr.*2d 663, 672 (1998) (reversing plaintiffs' verdict for failing "to establish all the necessary links in the chain").

In *Mirkin,* the plaintiffs, as here, invoked Section 533 of the *Restatement of Torts (Second),* which states that:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

The court, however, rejected the plaintiffs' proposition that a scheme allowing a person to state a claim based on secondhand misrepresentations also allowed reliance to be presumed on behalf of market investors. *Mirkin, supra,* 858 *P.*2d at 576. Instead, the court noted, "[r]eliance at common law has two components— awareness of the misrepresentation and action based thereon. The plaintiff in a fraud-on-the-market case under Rule 10b–5 *is not required to prove* the first component." *Id.* at 579 n. 8 (emphasis added).

## C.

Indirect reliance remains today what we held it to be in *Judson* and *Rosenblum, supra.* If proven, it is an element of a claim of fraud. If a party to a transaction makes a false statement to another party, intending or knowing that the other party in the transaction will hear it and rely on it, and the second party to the transaction actually hears the substance of the misrepresentation, by means however attenuated, and considers the actual content of that misrepresentation when making the decision to complete the transaction, then that person has established indirect reliance to support a fraud claim.

In this case, plaintiff has explicitly stated that she did not consider i-Stat's financial statements, either by herself or in consultation with an investment professional, but acted only on the market price. By that statement she denies that she ever considered i-Stat's sales volume in her buying decision. Thus, she has failed to establish that she relied, however indirectly, on the misstatements of i-Stat and its management. Therefore, under our traditional standard for proof of reliance, even indirect reliance, plaintiff fails to show reliance and, therefore, fails to make out a claim for fraud.

## IV.

In her brief, plaintiff correctly avers that, because she brought her claim before the enactment of SLUSA, she was "clearly entitled ... to seek redress under state law in state court." New Jersey provides, as do the other states and jurisdictions, a comprehensive statutory scheme of securities regulation and investor protection, the Uniform Securities Law (1997), *N.J.S.A.* 49:3–47 to –76 (the "USL"). Plaintiff here, however, has chosen not to proceed under the USL because the USL requires privity in securities-fraud actions and thus will not allow her to reach the issuer of her shares or its officers. *See N.J.S.A.* 49:3–71.

Although requiring privity can seem harsh when, as here, the victim of the alleged misstatement or omission is remote from the offending party, our Legislature imposed the requirement of privity to counterbalance an advantage for plaintiffs. The USL's drafters *rejected* any "requirement that the buyer prove reliance on the untrue statement or the omission. He must show only that *he did not know of it.*" Louis Loss, *Commentary on the Uniform Securities Act* 148 (1976) (Draftsmen's Commentary to § 410(a)). As a result, securities-fraud plaintiffs need only prove the misrepresentations and their ignorance of them, a significantly lower burden than that imposed by a common-law fraud action. As the Supreme Court of California stated in *Mirkin, supra,* 23 *Cal.Rptr.*2d 101, 858 *P.*2d at 580 (construing California securities statute) "the very purpose of [a statutory securities-fraud action] is to afford the victims of securities fraud ... a remedy without the formidable task of proving common law fraud" (quotations omitted).

Plaintiff in this action asks to be relieved of that burden in another fashion, preferable to her, through the use of the theory of fraud on the market. The Legislature, however, has already clearly stated its choice in approaching securities-fraud complaints: it did not lessen the proof required to demonstrate reliance on a misrepresentation, but instead eliminated reliance as an element of securities fraud entirely in favor of a system in

which privity establishes causation. *See* David O. Blood, Comment, *There Should Be No Reliance in the "Blue Sky"*, 1998 *B.Y.U. L.Rev.* 177, 205–08 (commenting on Uniform Securities Act of 1956, model for USL). The Legislature balanced the plaintiff's advantage of not having to show reliance with the defendant's advantage of being immune from liability to anyone out of privity. The USL reflects other balances as well, such as a shorter limitations period—two years instead of six years for common-law fraud—and a provision that actions and damages are limited to those provided in the statute. *N.J.S.A.* 49:3–71(g),(c).

While the USL does not control the development of the common law in this area, we are informed by the choices made by the Legislature when it enacted the state statutory scheme for securities fraud. Accordingly, plaintiff's arguments concerning the policy benefits of adopting fraud on the market as a method of proving reliance in common-law fraud may be evaluated from the vantage point of understanding the policy choices made by our Legislature in the USL, which are unhelpful to plaintiffs here; the deliberations of other jurisdictions that have considered the theory; and analysis of the theory by academics.

## V.

Since the Supreme Court accepted fraud on the market in *Basic, supra,* twelve years ago, no state court with the authority to consider whether *Basic* is persuasive has chosen to apply it to claims arising under its own state's laws. In considering whether to accept the theory, then, the persuasiveness of its intellectual underpinning, the Efficient Capital Markets Hypothesis, or ECMH, requires close examination. The ECMH proposes that the price of a stock reflects information known about a corporation whose securities trade publicly. The extent to which the price reflects that information is expressed by the three different forms of market efficiency—strong, semi-strong, and weak.

In a strong-form efficient market, all information that exists about a company and would be of interest to a purchaser of the

company's securities is reflected, nearly instantaneously, in the price of the stock, such that no individual can expect to gain a greater return from that security than from any other security, and no individual can hope to perform better than any other individual over the long term. The weak form of the ECMH, by contrast, proposes that the price of the stock eventually reflects publicly available information. There is widespread agreement among economists and investment professionals that the national stock markets of the United States display weak-form efficiency. *See* Barbara Black, *Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions,* 62 *N.C. L.Rev.* 435, 438 n.8 (1984).

Semi-strong efficiency, which is somewhere between the other two forms in holding that most information about a company is reflected in its price fairly quickly, appears to be the form assumed to exist by the United States Supreme Court in *Basic. See* Nathaniel Carden, Comment, *Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency,* 65 *U. Chi. L.Rev.* 879, 883 (1998).

The ECMH, perhaps because it posits that no investor can consistently outperform the market regardless of the amount of research or work undertaken beforehand, is a favorite subject for academics but is often discounted by investment professionals. For example, Warren Buffett, the well-known, successful investor, contends that proper study of a company's financial condition reveals its value far better than does the market price of its shares. Roger Lowenstein, *Buffett: The Making of an American Capitalist* 307–22 (1995).

The ECMH has suffered at the hands of academic writers as well:

> We think that the legal rush to embrace and apply the efficient market hypothesis has been overly precipitous and occasionally unwise.... [M]ore recent economic research and controversy about the hypothesis casts doubt on E[C]MH's empirical claims and theoretical underpinnings. Whether markets are efficient in the sense claimed by the initial tests is now highly suspect.... Virtually none of this doubt,

however, has been reflected in the debates about the implications of the efficient market hypothesis for legal decisionmaking.

[Jeffrey N. Gordon & Lewis A. Kornhauser, *Efficient Markets, Costly Information, and Securities Research*, 60 *N.Y.U. L.Rev.* 761, 764 (1985).]

As more time has passed, and there has been greater opportunity to examine and test market efficiency, the hypothesis has shown greater weakness.

The debate over the ECMH is fundamental because [it] is a major premise for a substantial body of corporate and securities law and scholarship [and] the United States Supreme Court has recognized the ECMH as a basis for satisfying the reliance requirement in certain securities-fraud cases. Moreover, since the late 1970s, a great deal of corporate and securities law scholarship has extolled the virtues of the ECMH and urged it as a basis to advocate many major policy prescriptions. Indeed, before the public capital market crash of October 1987, only a few sobering pieces stood to remind the legal community that the ECMH is only a hypothesis, and a dubious one at that.

[Lawrence A. Cunningham, *From Random Walks to Chaotic Crashes: The Linear Genealogy of the Efficient Capital Market Hypothesis*, 62 *Geo. Wash. L.Rev.* 546, 548–49 (1994).]

Because the ECMH fails to adjust for the noise and chaos inevitable in any system created by the acts of so many participants, one observer has gone so far as to contend that "obsolescence renders the ECMH false in all its forms." *Id.* at 548. Other writers have commented on causation uncertainty in understanding market reactions, noting, among other things: how inefficiently prices reflect earnings; how other publicly available financial information is underreflected; how other information, such as historical underperformance, affects price; and how the activities of underrational "noise traders" and those otherwise affected by investor sentiment distort the picture. *See* Victor L. Bernard, et al., *Challenges to the Efficient Market Hypothesis: Limits to the Applicability of Fraud–on–the–Market Theory*, 73 *Neb. L.Rev.* 781, 786–92 (1994).

Plaintiff argues that the academic debate goes to whether particular securities trade in efficient markets and that academics and courts remain confident that the markets are efficient. Defendants acknowledge that uncertainty whether the markets are efficient may not be reason enough to reject fraud on the market

where it has already been accepted, but argues that a theory, whose validity at best remains in question, provides poor support for an expansion of the common law.

Our own Chancery Division has noted the uncertainty regarding the validity of the ECMH:

> Most academics in the field of finance advocate a combination of the random walk and the efficient market theories. Most Wall Street professionals, the security analysts and portfolio managers, disagree. The academics say that the stock market is self-regulating as it reacts to new information, and random selection of investments will follow the market. The most dramatic example was the Forbes index, composed of twenty stocks chosen by throwing darts at a list of securities on the stock exchange. Professor Thaler and others believe that profits can be made from cracks in the efficient market, and the relative strength theory is another gloss on the random walk-efficient market theories. It has been supported, as well as criticized, in the literature.
>
> [*Johnson v. Johnson*, 212 *N.J.Super.* 368, 392, 515 *A.*2d 255 (1986).]

Other courts have also expressed misgivings about the ECMH. In *Mirkin, supra,* the California Supreme Court accepted that fraud on the market could underlie a statutory action, but expressly declined to accept or reject the ECMH even though that court did acknowledge that the dissemination of material information affects the prices of securities. 23 *Cal.Rptr.*2d 101, 858 *P.*2d at 579 & n. 7. Also, Chancellor Allen noted, "just as the Constitution does not enshrine Mr. Herbert Spencer's social statics, neither does the common law of directors' duties elevate the theory of a single, efficient capital market to the dignity of a sacred text." *Paramount Comms. Inc. v. Time Inc.* 1989 *WL* 79880, at *19 (Del.Ch. July 14), *aff'd* 571 *A.*2d 1140 (Del.1989).

Even at the time of the *Basic* decision, skeptical voices were heard. Dissenting from the majority opinion, Justice White wrote that "with no staff economists, no experts schooled in the 'efficient-capital-market hypothesis,' no ability to test the validity of empirical market studies, we are not well equipped to embrace novel constructions of a statute based on contemporary microeconomic theory." 485 *U.S.* 224 at 253, 108 *S.Ct.* at 994–95, 99 *L.Ed.*2d at 222. There is no greater proof now than there was

then that the theoretical foundation for the fraud-on-the-market theory is as strong as its proponents maintain.

Yet now, despite there being no basis for increased acceptance of the idea of fraud on efficient markets, plaintiff asks us to expand its use beyond the carefully balanced world of the federal securities laws to the vastly more diverse universe of common-law fraud claims. In addition to our skepticism concerning its validity when used in the context of securities markets, we note that plaintiffs in other jurisdictions have attempted to establish that markets in assets other than securities are efficient enough to allow use of the fraud-on-the-market theory. Various opinions we have examined have rejected use of the theory in those other settings. The Alabama Supreme Court has rejected the fraud-on-the-market theory numerous times in the consumer fraud context. *See Ex parte Household Retail Servs., Inc.,* 744 *So.*2d 871 (1999); *Ex parte Exxon Corp.,* 725 *So.*2d 930 (1998); *Butler v. Audio/Video Affiliates, Inc.,* 611 *So.*2d 330 (1992). *See also Sing v. John L. Scott, Inc.,* 134 *Wash.*2d 24, 948 *P.*2d 816, 827 (1997) (Talmadge, J., dissenting) (asserting consumer fraud on the market created by interested real estate agent insider dealing in competitive transaction between agent and principal).

The Appellate Division of the Supreme Court of New York was presented with the theory in an action for malpractice against accountants who allegedly gave improper tax advice to partners in tax shelters. *Ackerman v. Price Waterhouse,* 252 *A.D.*2d 179, 683 *N.Y.S.*2d 179 (1998). That court also dealt with the attempt of a season ticketholder of the then-New York Nets to rely on a fraud-on-the-market approach in certifying his fellow ticketholders as a class that had been defrauded when the team sold Julius Erving to the Philadelphia 76ers in 1976. *See Strauss v. Long Island Sports, Inc.,* 60 *A.D.*2d 501, 401 *N.Y.S.*2d 233 (1978). The plaintiff, who brought one of seven such actions, asserted that ticketholders were the equivalent of shareholders in such an action. *Id.* at 237.

We express no view on those cases and leave to another day whether in a proper case we would accept use of a theory akin to

fraud on the market if it were possible to determine reliably through such a theory that an unheard misrepresentation, in fact, was the factor inducing a fraudulent transaction. However, the cases noted above illustrate the danger of importing a specialized doctrine into an area of law that has general effect, like our common law of fraud. The doctrine of indirect reliance has developed with careful consideration given to its impact. Indirect reliance occurs when a single communication, an inducement to engage in a fraudulent transaction, is clearly communicated to the defrauded party. The price of a publicly traded stock, however, synthesizes a great variety of information and conveys as much of that information as possible. But the information is jumbled. No one piece of information survives clearly enough that the share price can be said to have passed it on clearly. Until study or experience can prove that an impersonal mechanism can communicate a single idea clearly, indirect reliance should not be expanded to include this theoretical model of market performance and excuse this plaintiff from her obligation to show individual reliance on the alleged misrepresentation.

Accepting fraud on the market as proof of reliance in a New Jersey common-law fraud action would undercut the public interest in preventing forum-shopping, weaken our law of indirect reliance, and run contrary to the policy direction of the Legislature and Congress. We decline to expand our law regarding satisfaction of the reliance element of a fraud action on the basis of a complex economic theory that has not been satisfactorily proven. In so holding, we note that plaintiff had available to her an adequate federal remedy perfectly suited to her complaint. She chose not to pursue it.

## VI.

Accordingly, the decision of the Appellate Division allowing the reliance element of a fraud claim to be proven by the fraud-on-the-market theory is reversed, and the judgment of the Superior Court, Law Division is reinstated, dismissing plaintiff's action.

STEIN, J., dissenting.

In this appeal, the issue before the Court is whether reliance on the integrity of the market price for a corporate security satisfies the reliance element of a cause of action for common law fraud. The Appellate Division held that it does. *Kaufman v. i-Stat Corp.*, 324 *N.J.Super.* 344, 735 *A.2d* 606 (1999). Because I believe that the Appellate Division's thorough and well-reasoned opinion reflects the correct disposition of that issue, I dissent.

I

The narrow issue before the Court is whether the fraud-on-the-market theory of reliance, articulated and adopted by the United States Supreme Court in *Basic Inc. v. Levinson*, 485 *U.S.* 224, 241–48, 108 *S.Ct.* 978, 989–92, 99 *L.Ed.2d* 194, 214–19 (1988), adequately may satisfy the reliance element of a state law claim for common law fraud.

A

A common-law fraud action has five elements. They are "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 148 *N.J.* 582, 610, 691 *A.2d* 350 (1997).

Since 1957 New Jersey has recognized that indirect reliance may satisfy the reliance element of a common law fraud action. See *Judson v. Peoples Bank & Trust Co.*, 25 *N.J.* 17, 27, 134 *A.2d* 761 (1957) (holding that misrepresentation by one family member made with intent that it be communicated to other family members sufficient to satisfy reliance element of common law fraud and observing that "reliance may be found by fair inference"); *Metric Investment, Inc. v. Patterson*, 101 *N.J.Super.* 301, 306, 244 *A.2d* 311 (App.Div.1968). Likewise, the *Restatement of Torts* states that

[t]he maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

[*Restatement (Second) of Torts* § 533 (1977).]

Thus, proof that a party deliberately made false representations with the intent that they be communicated to others for the purpose of inducing others to rely upon them may satisfy the reliance element of common law fraud.

In this appeal, i-Stat issued materially misleading public statements about its financial condition and prospects, subsequent to which the price of its stock rose. The stock market "act[ed] as the unpaid agent of the investor [and] inform[ed plaintiff] that given all the information available to it, the value of the stock is worth the market price." *Basic, supra,* 485 *U.S.* at 244, 108 *S.Ct.* at 990, 99 *L.Ed* 2d at 216 (quoting *In re LTV Securities Litigation,* 88 *F.R.D.* 134, 143 (N.D.Tex.1980)). Under the principle of indirect reliance applied by this Court in *Judson,* and consistent with the *Restatement (Second) of Torts'* position, i-Stat's intentional misrepresentation may be actionable as a common law fraud even though the authors of the false information did not communicate directly to plaintiff.

The question thus is whether the principle of indirect reliance applies in the context of purchasers of publicly traded securities where the fraud was perpetrated generally on the public with the intention that *all* purchasers of the securities would be defrauded. The answer to that question is found in the United States Supreme Court's analysis of the fraud-of-the-market theory in Section 10b–5 cases. 15 *U.S.C.A.* § 78j(b).

## B

In relevant part, the Securities and Exchange Commission's Rule 10b–5, 17 *C.F.R.* § 240.10b–5 (1987) (Rule 10b–5) provides that

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading .... in connection with the purchase or sale of any security.

A plaintiff who is injured by a violation of Rule 10b–5 may bring a claim under section 10b of the Securities Exchange Act of 1934 (the Exchange Act), 15 *U.S.C.A.* § 78a to 78mm. A claim brought under the Act requires that a plaintiff show the following: "(1) a false representation of (2) a material (3) fact; (4) defendant's knowledge of its falsity and his intention that plaintiff rely on it; (5) the plaintiff's reasonable reliance thereon; and (6) his resultant loss." *Peil v. Speiser,* 806 *F.*2d 1154, 1160 (3d Cir.1986) (citing 3 Loss, *Securities Regulation* 1431 (1961)). Reliance is an essential element of a cause of action under section 10b of the Act.

Prior to the United States Supreme Court's 1988 *Basic* decision, to satisfy the reliance element of a fraud claim brought under Rule 10b–5 victims of fraudulent misrepresentations were required to show that they actually relied on the misrepresentations made by defendants. For example, in *Vervaecke v. Chiles, Heider & Co.,* 578 *F.*2d 713, 719 (8th Cir.1978), the court of appeals found that the plaintiff, who did not receive or read the company's offering statements until after the commitment to purchase the defendant company's securities was made, was not permitted to proceed with his claim that the company's misleading offering statements caused his loss. Because the plaintiff could not in his own right make a claim, he was not permitted to represent a class of plaintiffs. *Ibid.* Likewise, in *Cavalier Carpets, Inc. v. Caylor,* 746 *F.*2d 749, 754–55 (11th Cir.1984), the Court of Appeals affirmed the District Court's determination that the plaintiffs in a Rule 10b–5 securities fraud suit were required to show "that they reasonably relied upon the [misrepresentations or omissions] or on the notion that [they] had received all the information from the [d]efendants that would be material and exercised due diligence in examining the information otherwise available to [them] which relates to the alleged misrepresentation or omission."

In *Basic, supra,* the Supreme Court first concluded that the reliance element in a claim based on fraudulent misrepresentations under Rule 10b–5 may be satisfied by proof that the plaintiff relied on the integrity of the market price. 485 *U.S.* at 247, 108 *S.Ct.* at 992, 99 *L.Ed.*2d at 218. The Supreme Court stated that the fraud-on-the-market theory of reliance is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* at 241–42, 108 *S.Ct.* at 989, 99 *L.Ed.*2d at 215 (quoting *Peil, supra,* 806 *F.*2d at 1160–61). As such, "[t]he causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations." *Ibid.*

The fraud-on-the-market theory of reliance is but a rebuttable presumption of reliance. *Id.* at 245, 108 *S.Ct.* at 990, 99 *L.Ed.*2d at 217. The Supreme Court found that it was fair to allow reliance to be presumed in Rule 10b–5 cases because requiring "a plaintiff to show a speculative state of facts, *i.e.,* how he would have acted if omitted material information had been disclosed or if the misrepresentation had not been made would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market." *Ibid.* (citations omitted).

Defendants may "rebut proof of the elements giving rise to the presumption, or show that the misrepresentation in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false." *Id.* at 248, 108 *S.Ct.* at 992, 99 *L.Ed.*2d at 219 (citation omitted). Similarly, the presumption may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price" or if credible information "entered

the market and dissipated the effects of the misstatements." *Id.* at 249, 108 *S.Ct.* at 992, 99 *L.Ed.*2d at 219.

The rationale behind the Supreme Court's reasoning is that "[t]he market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price." *Id.* at 244, 108 *S.Ct.* at 990, 99 *L.Ed.*2d at 216 (quoting *In re LTV, supra,* 88 *F.R.D.* at 143). Accordingly, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action." *Id.* at 247, 108 *S.Ct.* at 992, 99 *L.Ed* 2d at 218. Thus, the fraud-on-the-market theory of reliance is sufficient to satisfy the reliance element of a Rule 10b–5 claim.

The *Basic* Court's holding that the use of the fraud-on-the-market theory may satisfy the reliance element of a Rule 10b–5 claim is not based on the specific language of the Act. *Kaufman, supra,* 324 *N.J.Super.* at 351, 735 *A.*2d 606. Instead, the holding relies on the fact that the reliance elements of securities law claims and common law fraud actions are virtually identical. *Basic, supra,* 485 *U.S.* at 243, 108 *S.Ct.* at 989, 99 *L.Ed.*2d at 215. Accordingly, "the reasoning of *Basic* and other cases brought under federal securities law is equally applicable to a common law action for securities fraud." *Kaufman, supra,* 324 *N.J.Super.* at 352, 735 *A.*2d 606.

For an action to be maintained as a class action, "questions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members." *Rule* 4:32–1(b)(3). Without the fraud-on-the-market theory of reliance in securities fraud cases, each individual plaintiff would be required to prove his or her own actual reliance on the fraudulent misrepresentation or omission of the defendant. In that context, individual issues of reliance would predominate over common issues and class action certification generally would be denied.

*See, e.g., Gross v. Johnson & Johnson–Merck Consumer Pharms. Co.,* 303 *N.J.Super.* 336, 350, 696 *A.*2d 793 (Law Div.1997)(denying class certification because question of each plaintiff's reliance proved to be highly individualized and complex); *In re Hotel Telephone Charges,* 500 *F.*2d 86, 89 (9th Cir.1974) (noting that class action treatment may be unsuitable in fraud case if there are material variations in representations made or in kinds or degrees of reliance by plaintiffs).

The majority refers to limitations on the fraud-on-the-market theory of reliance and notes that commentators and investors may disagree about whether the market price of a security fully reflects the present value of a company. *Ante* at 113–17, 754 *A.*2d at 1198–1200. However, adoption of the fraud-on-the-market principle does not require us to "adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic, supra,* 485 *U.S.* at 248, n. 28, 108 *S.Ct.* at 992, n. 28, 99 *L.Ed.*2d at 219, n. 28. It requires merely that we accept that "[t]he idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings [sic] about a situation where the market price reflects as nearly as possible a just price." *Id.* at 246, 108 *S.Ct.* at 991, 99 *L.Ed.*2d at 217 (quoting *H.R.Rep. No. 73–1383,* at 11 (1934)). The significance of the fraud-on-the-market principle derives not from the infallibility of the market price of securities but rather from the theory's implicit acknowledgment that the investing public is entitled to assume that SEC-mandated disclosures have been made and that fraudulent misrepresentations have not unlawfully affected the market price.

## II

The majority asserts that to accept the fraud-on-the-market theory of reliance as proof of reliance in a common law fraud suit would "undercut the public interest in preventing forum-shopping, weaken our law of indirect reliance, and run contrary to the policy

direction of the Legislature and Congress." *Ante* at 118, 754 *A*.2d at 1200–01. Those arguments are unpersuasive.

## A

The Appellate Division cogently reasoned that "a defendant's misrepresentation may be an immediate cause of a plaintiff's injury-producing conduct even though the defendant did not make the misrepresentation directly to the plaintiff, and even though the plaintiff never heard or read the precise words of the misrepresentation." *Kaufman, supra,* 324 *N.J.Super.* at 352, 735 *A*.2d 606 (citation and quotation omitted). The Appellate Division also rejected the claim that the fraud-on-the-market theory of reliance should not be adopted merely because plaintiffs have an adequate remedy available under federal law. *Id.* at 353, 735 *A*.2d 606. As Judge Skillman observed: "The Securities Exchange Act of 1934 states that 'the rights and remedies provided by this chapter shall be in addition to any and all remedies that may exist at law or in equity.' 15 *U.S.C.A.* § 78bb(a)." *Ibid.* Thus, "Congress contemplated that federal remedies for securities fraud would supplement rather than preempt whatever remedies a state may elect to afford." *Ibid.* "[I]n the absence of any expression of congressional intent to preempt state law or limit state remedies, [the Appellate Division could] perceive no reason why, as a matter of state policy, [it] should deny an effective state remedy to a defrauded investor simply because she also has a remedy under federal law." *Ibid.* *See also Herman & MacLean v. Huddleston,* 459 *U.S.* 375, 388–389, 103 *S.Ct.* 683, 691, 74 *L.Ed.*2d 548, 560 (1983) (observing that securities laws were in part designed to add to protections provided investors by common law).

Moreover, class action lawsuits for securities fraud are so few in number that the adoption of the fraud-on-the-market theory as a rebuttable presumption of reliance will have little or no impact on the operation of state courts. For example, in 1999, 216 securities class action suits were filed in federal courts. *Stanford Securities Class Action Clearinghouse,* (visited Jul. 6, (2000) <http://securi-

ties.stanford.edu>). Approximately forty-five securities class action suits were filed in state courts in 1999 and over half of those lawsuits were filed in California. *Ibid.* In contrast, in 1998 (the most recent year for which information is available), over fifteen million civil cases were filed in state courts nationwide. *National Ctr. for State Courts et. al., Examining the Work of State Courts,* (1998) (2000). The fact is that securities fraud cases represent only an infinitesimally small percentage of civil cases.

Moreover, the enactment by Congress of legislation restricting the fora in which victims of securities fraud may sue limits further those plaintiffs who are permitted to maintain a securities fraud cause of action in state courts. Initially, in 1995 Congress passed the Private Securities Litigation Reform Act (PSLRA). PSLRA imposed many procedural restrictions on federal class-action plaintiffs. In 1998 Congress enacted the Securities Litigation Uniform Standards Act (SLUSA), which sharply limits the number of securities fraud class action suits that may be brought in state courts. SLUSA, by its terms, preempts all but a limited group of future class action common law fraud claims that would otherwise be filed in state court and requires that they be filed in federal court. SLUSA provides that the vast majority of class actions, including suits such as the one at bar, that are based on a state's statutory or common law alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" or "any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security" may not be brought in a state court. 15 *U.S.C.A.* § 78bb(f)(1)(A) and (B). SLUSA prevents all but state or municipal entities, state pension funds, or classes comprised of less than fifty plaintiffs from filing suit in a state court. The majority's conclusion, *ante* at 107, 754 *A.*2d at 1194, that "the excepted plaintiffs remaining under SLUSA, ... could still bring a significant amount of litigation" is overstated.

Nevertheless, the PSLRA and SLUSA permit specific but restricted classes of plaintiffs to maintain their causes of action in

state court. In the absence of congressional intent to the contrary, those plaintiffs should be permitted to have the benefit of the fraud-on-the-market theory of reliance under our common law fraud doctrine.

### B

The statute of limitations for a lawsuit for securities fraud brought in federal court under Rule 10b–5 is shorter than a suit for common law fraud brought in state court. *Compare* 15 *U.S.C.A.* § 78i(e) (claims under section 10(b) of 1934 Act must be brought within one year of discovery of violation) *with N.J.S.A.* 2A:14–1 (statute of limitations governing common law fraud is six years). Federal suits brought under Rule 10b–5 also differ from common law fraud claims in that they do not permit punitive damages to be awarded. *Compare* 15 *U.S.C.A.* § 78bb(a) *with Gennari, supra,* 148 *N.J.* at 610, 691 *A.*2d 350 (finding that "[b]ecause [the defendants] are liable for common-law fraud, they are subject to punitive damages"). Those differing treatments of the two types of lawsuits should not induce this Court artificially to restrict the parameters of a cause of action sounding in common law fraud. If those disparities disturb the legislature, it can readily adopt a statute of limitations provision and limits on punitive damages analogous to those congressionally-imposed limitations in Rule 10b–5 cases.

### III

Recognizing fraud on the market as a means of proving reliance in common law fraud actions requires "merely an application of existing common law principles expressed in the indirect reliance cases from ... other jurisdictions, and in the Restatement Second of Torts." *Mirkin v. Wasserman,* 5 *Cal.*4th 1082, 23 *Cal.Rptr.*2d 101, 858 *P.*2d 568, 593 (1993) (Kennard, J., concurring in part and dissenting in part). It requires only that we recognize that "[t]he genius of the common law is its flexibility and capacity for growth and adaptation." *Russick v. Hicks,* 85 *F.Supp.* 281, 285 (D.Mich.

1949) (citing *Funk v. United States,* 290 *U.S.* 371, 54 *S.Ct.* 212, 78 *L.Ed.* 369 (1933)). "It has always been recognized that the common law is not a rigid, inflexible, static thing, but is a living organism, ever growing and expanding to meet the problems and needs of changing social and economic conditions." *Ibid.* Merely because an asserted right is somewhat novel is "not [a] valid reason[ ] for denying its existence.... The common law is not a primer of rigid and absolute rules, but rather a body of broad and comprehensive principles created by judicial decisions and based on justice, reason, and common sense." *Id.* at 285–86.

I would affirm the judgment of the Appellate Division. Justice O'HERN and Justice LONG join in the opinion.

*For affirmance in part, reversal and reinstatement in part*— Chief Justice PORITZ and Justices COLEMAN, VERNIERO, and LaVECCHIA—4.

*For affirmance*—Justices O'HERN, STEIN, and LONG—3.